T.C. Memo. 2010-284

UNITED STATES TAX COURT

HUMPHREY EDEFUA IGBERAESE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23000-08.             Filed December 28, 2010.

Humphrey Edefua Igberaese, pro se.

Vivian N. Rodriguez, for respondent.

MEMORANDUM OPINION

MORRISON, Judge:  This case is a redetermination of the
deficiency respondent, the Internal Revenue Service (IRS), had
determined in petitioner Humphrey Edefua Igberaese's 2005 federal
income tax.  The issues for decision are whether he (1) incurred,
and complied with applicable substantiation requirements for, the
amounts he claimed as business-travel, charitable-contribution,

and casualty-loss deductions; (2) is entitled to a deduction for a business suit, shoes, and dry cleaning; (3) is subject to accuracy-related and late-filing penalties; and (4) was denied due process of law by being denied certain opportunities for administrative review.[1]

### Background

1. Introduction

In 2005, the year at issue, Igberaese lived in Miramar, Florida. He worked as a senior operating engineer for the courier company FedEx. Igberaese's 2005 tax return was due on April 15, 2006. He filed the return on January 8, 2007. He attributes the delay to his divorce proceeding, which began in 2005 and was still unresolved when his Tax Court trial occurred, in April 2009.

The IRS audited Igberaese's return and, in 2008, mailed him a notice of deficiency. In the notice, the IRS determined a deficiency of $11,854, on the grounds that several deductions were disallowed: (1) the entire $17,576 he claimed for travel to professional conferences, (2) the entire $1,500 he claimed for a business suit, shoes, and dry cleaning, (3) the entire $10,400 he claimed for cash contributions to a church, (4) the entire

---

[1]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

$16,000 he claimed for contributions of used clothing and household goods to a charity, and (5) $2,723 of the $5,340 he claimed for hurricane damage to his house and yard.  The notice also determined that Igberaese was liable for a $1,715.23 late-filing penalty, as well as a $2,370.80 "accuracy-related" penalty (the latter penalty on the grounds of substantial understatement of income tax or, alternatively, negligence).  Igberaese contests each of the IRS's determinations.  He still lived in Florida when he filed the petition.

2.   Business-Travel Mileage

On the IRS Form 2106, Employee Business Expenses, which he attached to his Form 1040, U.S. Individual Income Tax Return, Igberaese reported that his vehicle was driven 38,978 miles in 2005.  The Form 2106 says that these miles consisted of 29,623 "business miles", 3,120 "commuting miles", and 6,235 "other miles".  Although the form asks the taxpayer for all three categories of miles, it provides for the computation of a deduction only for the "business miles".  (Igberaese does not claim a deduction for miles in any other category.)  In recognition of the change in the IRS standard mileage rate during 2005, the form directs the taxpayer to multiply the number of "business miles" driven before September 1, 2005, by 40.5 cents and to multiply the number of "business miles" driven after August 31, 2005, by 48.5 cents.  The dollar figures Igberaese

entered on the lines for the results of this multiplication correspond to 19,748 "business miles" for each period, for a total of 39,496 "business miles". Igberaese did not explain why he claimed deductions reflecting 39,496 miles, a number that is greater than the number of miles he reported for "business miles", and, indeed, for all categories of miles combined. We infer that he completed the return carelessly.

Igberaese claims that his mileage deduction relates to his trips to professional-association conferences to maintain skills important to his employment. He claims that his employer did not reimburse him for costs of attending these conferences because his employer did not require him to attend. Igberaese's only documentary evidence relating to the trips is a few pages in a small notepad. A typical entry is as follows:

```
Trip Purpose:
     * * * Technical and Career Conference
Venue: Dallas, TX
Start Date: January 6, 05
Return Date: January 9, 05
Roundtrip Mileage: 4128
```

We infer that the dates Igberaese recorded as "Start Date" and the "Return Date" are the beginning and ending dates of the conferences, not the beginning and ending dates of the purported travel, because the periods are very short in relation to the distances purportedly driven (from, in each case, southern Florida). Besides the Dallas entry, the other entries are for a 3,828-mile round trip to Boston for a four-day conference on

March 24-27; a 6,854-mile round trip to Anaheim, California for a three-day conference on September 29-October 1; a 6,420-mile round trip to San Diego, California for a six-day conference on October 11-16; and a 6,744-mile round trip to Anaheim, California for a three-day conference on November 3-5.

Igberaese did not produce any other evidence that he attended the conferences.  He testified that he drove alone, taking only two or three days to travel from southern Florida to California.

3.  Suit, Shoes, and Dry Cleaning

Igberaese did not present any evidence regarding this deduction.

4.  Cash Charitable Contributions

Igberaese asserts that he contributed $200 to his church in cash every week of the year, for a total of $10,400.  He said that when he was in town, he would attend church and would personally donate the $200 to the church.  He said that when he would be out of town, he would provide the cash to other church members in sealed envelopes to take to the church for him.  He said he did not recall, even approximately, how often he provided the cash to other church members to donate for him.  Nor did he remember the names of any of these members.  He presented a printout of a computer spreadsheet consisting of the name of the church, the date of each contribution (each Sunday of the year),

the amount of each contribution ($200), and the yearly total ($10,400). He testified that he made each entry around the time of that week's contribution.

5.  Noncash Charitable Contributions

Igberaese made a donation of clothing and household goods to the Vietnam Veterans of America, an organization which raises some of its funds by accepting donations of household items and reselling them through third-party retailers. The parties stipulated the authenticity of a receipt that was signed by a representative of Vietnam Veterans of America and has boxes checked indicating that Igberaese's donation included items in the preprinted categories of "Bags of Clothing", "Miscellaneous", "Electrical Appliances", "Drapes or Bedding", "Furniture (describe)", and "Other (describe)". The receipt bears the handwritten description "Computer, Printer" for the "Other" items, but does not describe the "Furniture".

Igberaese presented to the Court a spreadsheet purporting to list the items he donated, their purchase prices, and their values at the time of donation. Each entry in the spreadsheet corresponded to a type of item he claims to have donated, such as "business suits", rather than a specific item. He testified that he prepared the spreadsheet in response to an IRS auditor's request. He also testified that the spreadsheet was based on (1) his memory of the purchase prices of the items and (2) a

handwritten list of the items that he prepared around the time of the donation (a list that he did not present to us).  A sample of the spreadsheet follows:

| Item | Quantity | Purchase price, each | Value, each |
|---|---|---|---|
| Men's dress shoes | 10 | $230 | $100 |
| Casual shoes | 5 | 125 | 70 |
| Athletic shoes | 8 | 125 | 60 |
| Business suits | 10 | 450 | 250 |
| Business shirts | 15 | 125 | 70 |
| Business pants | 10 | 95 | 50 |
| Casual shirts | 20 | 85 | 40 |
| Casual pants | 12 | 65 | 30 |
| Athletic wear | 9 | 55 | 30 |
| Blankets and sheets | 12 | 350 | 150 |

Igberaese admits that he did not compile the values in the spreadsheet until his return came under audit, at which time he arrived at a total value of $16,000, precisely equal to the amount of the noncash-contribution deduction he had claimed on his return.

6.  Casualty Loss

Hurricane Wilma hit southern Florida in October 2005. Igberaese claimed a casualty-loss deduction of $5,340 on his return, asserting that the loss was due to "Hurricane Wilma damages".

Shortly after the hurricane, an insurance agent determined that the hurricane had caused $2,617 in structural damage:  $555 to the roof, $1,627 to the garage, $250 to a sprinkler line, and $185 to a structure supporting a mailbox.  The insurance company did not compensate Igberaese for this damage because it did not exceed his $5,340 policy deductible.

Igberaese testified that his yard was also damaged as a result of the hurricane, but that his insurance company did not address this damage.  (He did not explain why the insurance company did not address the damage.)  He testified that the hurricane ruined the flower beds and some trees in his yard and that the heavy equipment used to remove debris from his yard after the hurricane severely damaged his lawn.  Igberaese further testified that he was not able to find a reputable company to repair the damage, as it is very difficult to do so shortly after a hurricane, and that he as a consequence hired a less-established contractor named Oswaldo Esquivel.  Igberaese testified that he paid Esquivel about $5,000 in cash to restore his landscape.  In support, he presented a document he identifies as a handwritten receipt from Esquivel.  The document lists $1,000 to clean up the remains of three palm trees and two flower beds, $3,000 to purchase and plant three royal palm trees, and $1,340 to re-sod the lawn and replant a flower bed, for a total of $5,340.

Besides his own testimony, Igberaese did not present any evidence of the casualty loss.  Igberaese conceded that he did not take pictures of the damage to his flower beds or trees, explaining that he had been "rattled" by the hurricane.  He also conceded that he did not have anything other than the Esquivel receipt to corroborate that he had paid the $5,340 amount.  He explained that his bank account was affected by fraud and closed in 2006.  He said that he had made several requests for bank statements relating to that period to corroborate the payment, but that the bank said it did not have the records.  He did not corroborate the existence of the alleged fraud or alleged refusal to provide bank statements.

## 7.  Late-Filing Penalty

Igberaese testified that he was unable to timely file his 2005 return because he was "involved with a very difficult divorce, one that is currently still going on in appeal.  * * * Between my regular job * * * and attending court proceedings, I was unable to make the deadline."  He also testified, and the IRS does not dispute, that 2005 was the first year in which he failed to timely file an income-tax return.[2]

---

[2]Igberaese asserts on brief that some records were inaccessible to him during the divorce.  We disregard this statement as inadmissible hearsay.  See Fed. R. Evid. 801 and 802 (hearsay); see also Rule 143(c) (statements in briefs not taken into account as evidence).  He has not shown that any problem in obtaining records from his ex-wife contributed to his failure to present evidence to the Court.

8.   Accuracy-Related Penalty

Igberaese did not present additional evidence in opposition to an accuracy-related penalty but simply argues that his deductions were accurate, adequately substantiated, and claimed in good faith.

9.   Alleged Due-Process Violation

It appears to be undisputed that the IRS regularly grants taxpayers an opportunity to resolve their disputes relatively informally through a conference with its Appeals Office before issuing a notice of deficiency, but that it did not give Igberaese a conference before issuing the deficiency notice. Instead, it granted him this opportunity only after issuing the deficiency notice. Igberaese contends that this constitutes a due-process violation. In addition, Igberaese contends that the Appeals officer did not adequately consider materials he submitted.

## Discussion

1.   Burden of Proof

The petitioner generally has the burden of proof. Rule 142(a). This means that if the evidence before us is in equipoise or otherwise insufficient to carry that burden, we will generally sustain the IRS's determination as to a given issue. See Elliott v. Commissioner, 40 T.C. 304, 311 (1963). Section 7491(a) shifts to the IRS the burden of proof on a given factual

issue relevant to the taxpayer's liability if the taxpayer introduces credible evidence, has complied with applicable substantiation requirements, has maintained all required records, and has cooperated with reasonable information requests from the IRS.  The taxpayer bears the burden of proving that he or she has met the prerequisites of section 7491(a).  See Miner v. Commissioner, T.C. Memo. 2003-39; H. Conf. Rept. 105-599, at 239 (1998), 1998-3 C.B. 747, 993; S. Rept. 105-174, at 45 (1998), 1998-3 C.B. 537, 581.

Igberaese argues on brief that the burden of proof should be shifted to the IRS as to each of the deductions at issue (except for the deduction for a suit, shoes, and dry cleaning, which he does not mention at all on brief).  We disagree.  We do not find the evidence Igberaese introduced to be credible.  As we discuss in connection with each deduction, Igberaese presented little beyond his own unpersuasive testimony and self-created documentation to corroborate his series of implausible deductions.  Several of his explanations for the absence of further corroboration were also implausible.  We are often skeptical of "uncorroborated testimony [that is] inherently unlikely".  Tokh v. Commissioner, T.C. Memo. 2001-45, affd. 25 Fed. Appx. 440 (7th Cir. 2001).  We are similarly skeptical of Igberaese's documentary evidence, which shows little more than that he has written down his implausible assertions.

## 2.   Business-Travel Mileage

Section 162(a) provides a deduction for business expenses, including, under section 162(a)(2), "traveling expenses * * * while away from home in the pursuit of a trade or business".  If the trade or business is that of performing services as an employee, those deductions are classified as "miscellaneous itemized" deductions.  Miscellaneous itemized deductions are allowed only to the extent that they in total exceed 2 percent of adjusted gross income.  Secs. 62(a)(2), 63(d), 67.

Section 1.6001-1(a), Income Tax Regs., requires taxpayers to keep records sufficient to establish the amounts of the deductions (and other items) on their returns.  Section 274(d) provides that certain kinds of expenditures, including expenses of traveling away from home, are not deductible unless the taxpayer corroborates certain details:

> No deduction or credit shall be allowed * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel * * *, (C) the business purpose of the expense or other item * * *[3]

---

[3]Sec. 1.274-5T(c)(4) and (5), Temporary Income Tax Regs., 50 Fed. Reg. 46022 (Nov. 6, 1985), permits a taxpayer to otherwise substantiate a deduction in exceptional circumstances where the taxpayer was unable to fully comply with the strict substantiation requirements at the time the relevant expenditure was incurred or where the taxpayer has lost records.  Nothing indicates that either exception applies in this case.

This "strict substantiation" rule overrides the general rule of Cohan that we may estimate deductions where evidence is inadequate. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930) (estimation of deductions, bearing heavily against taxpayer whose inexactitude is of his or her own making); Sanford v. Commissioner, 50 T.C. 823, 827 (1968) (strict-substantiation provision takes precedence over Cohan rule), affd. 412 F.2d 201 (2d Cir. 1969).

In the case of deductions for travel away from home, section 1.274-5T(c)(2) and (b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017, 46014 (Nov. 6, 1985), interprets section 274(d) to require a taxpayer to maintain a contemporaneous log or similar record which establishes (i) the amount of each expenditure or category of expenditure, (ii) the dates of departure and return for each trip away from home and the number of days away from home spent on business, (iii) the destination of travel, and (iv) the business purpose of the trip.

Section 1.274-5(j)(2), Income Tax Regs., permits a taxpayer to deduct an amount as vehicle expenses for traveling away from home on the basis of a mileage rate in accordance with other guidance which the IRS may prescribe. The IRS prescribed automobile-travel mileage rates for the first eight months of 2005 in Rev. Proc. 2004-64, 2004-2 C.B. 898, and the rates for

the last four months of 2005 in Announcement 2005-71, 2005-2 C.B. 714.

Igberaese's alleged business travel is uncorroborated, and would be so unnecessarily onerous to most people that it is inherently unlikely. As a result, we disallow all of the mileage deductions. We are also skeptical of all of his testimony and self-created documents relating to other issues in this case.

3. Suits and Dry Cleaning

Igberaese claimed an employee-business-expense deduction of $1,500 for a business suit, shoes, and dry cleaning. He did not present any evidence regarding this deduction. The cost of buying and maintaining clothes is deductible only if the clothing is (1) required for the taxpayer's employment, (2) not suitable for general or personal wear, and (3) not used for general or personal wear. See Hynes v. Commissioner, 74 T.C. 1266, 1290-1291 (1980). Igberaese has not shown that these requirements have been met.

4. Cash Charitable Contributions

Section 170(a) provides in part that "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." Section 1.170A-13(a), Income Tax Regs., provides the following standards for substantiating charitable contributions:

> (1) In general.--If a taxpayer makes a charitable
> contribution of money in a taxable year beginning after

December 31, 1982, the taxpayer shall maintain for the contribution one of the following:

(i)  A cancelled check.

(ii) A receipt from the donee charitable organization showing the name of the donee, the date of the contribution, and the amount of the contribution. A letter or other communication from the donee charitable organization acknowledging receipt of a contribution and showing the date and amount of the contribution constitutes a receipt for purposes of this paragraph (a).

(iii) In the absence of a canceled check or receipt from the donee charitable organization, other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution.

(2) Special rules.--(i) Reliability of records.-- The reliability of the written records described in paragraph (a)(1)(iii) of this section is to be determined on the basis of all the facts and circumstances of a particular case.  In all events, however, the burden shall be on the taxpayer to establish reliability.  Factors indicating that the written records are reliable include, but are not limited to:

(A) The contemporaneous nature of the writing evidencing the contribution.

(B) The regularity of the taxpayer's recordkeeping procedures.  For example, a contemporaneous diary entry stating the amount and date of the donation and the name of the donee charitable organization made by a taxpayer who regularly makes such diary entries would generally be considered reliable.

(C) In the case of a contribution of a small amount, the existence of any written or other evidence from the donee charitable organization evidencing receipt of a donation that would not otherwise constitute a receipt under paragraph (a)(1)(ii) of this section (including an emblem, button, or other token traditionally associated with a charitable organization

and regularly given by the organization to persons
making cash donations).

Section 170(f)(8) and section 1.170A-13(f), Income Tax Regs., set

forth more stringent substantiation requirements for

contributions of $250 or more.  But they do not govern the

deductibility of Igberaese's alleged donations of $200 per week.

Igberaese argues that his spreadsheet satisfies the

requirement in section 1.170A-13(a)(1)(iii), Income Tax Regs.,

that the taxpayer keep a "reliable written record[ ] showing the

name of the donee, the date of the contribution, and the amount

of the contribution" because the "contemporaneous nature of the

writing evidencing the contribution" and the "regularity of the

taxpayer's recordkeeping procedures" indicate the spreadsheet is

reliable.  See sec. 1.l70A-13(a)(2)(i)(A) and (B), Income Tax

Regs.[4]

Igberaese's implausible and uncorroborated mileage-deduction

claim casts doubt on all of his other testimony and

recordkeeping.  Furthermore, the idea that Igberaese would

regularly entrust fellow church members with substantial sums of

money but not remember who any of the individuals were or even

roughly how often he did this is also implausible.  Thus, we do

not find Igberaese's spreadsheet to be reliable.  We also do not

---

[4]In support of the second part of this argument, Igberaese
cited a passage in IRS Publication 526, Charitable Contributions,
which is similar to the regulation.  We cite the regulation
instead because informal IRS publications are not themselves law.

find that he has established that he made any part of the alleged donations to his church. Thus, as we explain later in connection with Igberaese's noncash contributions, we do not have the occasion to consider whether any deduction should be allowed for donations that occurred but were not documented in accordance with regulations.

5.   Noncash Charitable Contributions

Section 1.170A-13(b), Income Tax Regs., prescribes the recordkeeping standard relevant to Igberaese's claimed noncash contribution deduction:

> Charitable contributions of property other than money made in taxable years beginning after December 31, 1982.--(1) In general.--Except in the case of certain charitable contributions of property made after December 31, 1984, to which paragraph (c) of this section applies [generally, a deduction of an item for which a deduction of over $5,000 is claimed], any taxpayer who makes a charitable contribution of property other than money in a taxable year beginning after December 31, 1982, shall maintain for each contribution a receipt from the donee showing the following information:
>
> (i) The name of the donee.
>
> (ii) The date and location of the contribution.
>
> (iii) A description of the property in detail reasonably sufficient under the circumstances. Although the fair market value of the property is one of the circumstances to be taken into account in determining the amount of detail to be included on the receipt, such value need not be stated on the receipt. A letter or other written communication from the donee acknowledging receipt of the contribution, showing the date of the contribution, and containing the required description of the property contributed constitutes a receipt for purposes of this paragraph.  A receipt is

not required if the contribution is made in circumstances where it is impractical to obtain a receipt (e.g., by depositing property at a charity's unattended drop site). In such cases, however, the taxpayer shall maintain reliable written records with respect to each item of donated property that include the information required by paragraph (b)(2)(ii) of this section.

(2) Special rules.--(i) Reliability of records.-- The rules described in paragraph (a)(2)(i) of this section [rules placing the burden of establishing reliability upon the taxpayer and providing certain factors to be used in evaluating reliability in the light of all of the facts and circumstances, as we discussed earlier] also apply to this paragraph (b) for determining the reliability of written records described in paragraph (b)(1) of this section.

(ii) Content of records.--The written records described in paragraph (b)(1) of this section shall include the following information and such information shall be stated in the taxpayer's income tax return if required by the return form or its instructions:

(A) The name and address of the donee organization to which the contribution was made.

(B) The date and location of the contribution.

(C) A description of the property in detail reasonable under the circumstances (including the value of the property) * * *

(D) The fair market value of the property at the time the contribution was made, the method utilized in determining the fair market value, and, if the valuation was determined by appraisal, a copy of the signed report of the appraiser.

Several aspects of the spreadsheet combine to cause us to find it unreliable. First, the purchase prices seem rather high. Second, the values seem high for used items. According to the spreadsheet, each of the donated items had been acquired during

2001-2003, which would make them 2 to 4 years old when donated. Third, we do not know how Igberaese determined the values of the items, other than that they were, according to his testimony, what a willing buyer would pay a willing seller.[5]  Fourth, many of the quantities of items seem high, considering that Igberaese claimed to have purchased the items over the relatively short span of three years.  Fifth, the information on the spreadsheet is uncorroborated.  Sixth, Igberaese admits that he did not compile the values until his return came under audit, at which time he arrived at a total value of $16,000, precisely equal to the amount of the noncash-contribution deduction he had claimed on his return.  Seventh, Igberaese's implausible and uncorroborated mileage-deduction claim casts doubt on all of his testimony and recordkeeping.

In Kendrix v. Commissioner, T.C. Memo. 2006-9, we noted that section 170(a) provides that "A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."  Because Igberaese's spreadsheet is unreliable, his deduction has not been "verified under regulations prescribed by the Secretary."  This Court appears not

_____

[5]On the IRS Form 8283, Noncash Charitable Contributions, which he attached to his return, Igberaese stated that the method used to determine the value of the property was "Straight line depreciation".  Igberaese did not explain to the Court what this meant.  It is not apparent to us that such a method would be reasonable under the circumstances or that he used it at all.

to have squarely addressed whether such a deduction should be disallowed entirely or whether some deduction may be allowed under the <u>Cohan</u> rule.  See <u>Kendrix v. Commissioner</u>, <u>supra</u>.  We need not decide whether to apply the <u>Cohan</u> rule here because Igberaese has failed to establish that he actually made a donation of any substantial value.  Without "that assurance from the record, relief to the taxpayer would be unguided largesse".  <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957).

6.   <u>Casualty Loss</u>

The IRS objected to the receipt on hearsay and authenticity grounds.  We directed the parties to address the objection in their briefs.  We do not exclude the receipt from evidence on the ground of hearsay:  if genuine, it is a kind of record which would be regularly prepared in the course of a contractor's business.  See Fed. R. Evid. 803(6).  We do not exclude the receipt on grounds of authenticity, either.  Rule 901(a) of the Federal Rules of Evidence provides that the requirement of authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims".  That rule does not require that the Court actually find that the evidence is authentic.  See <u>United States v. Caldwell</u>, 776 F.2d 989, 1002 (11th Cir. 1985).  Igberaese testified that the receipt was authentic.  Because we conclude that his testimony is sufficient to support a finding that the receipt is

authentic, we admit the receipt.  As we explain next, the circumstances under which Igberaese presented the receipt to us cast grave doubt on whether it was prepared by a contractor and whether it accurately reflects an expenditure.  We conclude, therefore, that it has minimal probative value.

The $5,340 amount of the receipt is itself suspect.  After Igberaese filed his return (on which he reported a $5,340 deduction for Hurricane Wilma damage), his return was audited. He supplied the IRS auditor with the two documents that he later presented to us to support the deduction:  (1) the report of the insurance agent, which estimated the structural damage at $2,617, and (2) the $5,340 receipt for repairing the landscape damage. The total casualty loss that these two documents purport to indicate is $7,957.  Igberaese did not explain why he claimed a casualty loss of only $5,340 on his return.  A number of explanations suggest themselves.  One possibility is that Igberaese unjustifiedly claimed a deduction equal to the amount of his insurance deductible, thinking that this would not provoke extensive scrutiny,[6] and, when questioned by the IRS, hastily created a receipt that exactly matched the deduction.[7]

----

[6]Because homes are commonly insured, and losses compensated by insurance are not deductible, a taxpayer could expect that an auditor would ask for a detailed explanation of losses in excess of the taxpayer's policy deductible.  See sec. 165(a).

[7]Another possibility is that Igberaese recalled only the yard damage when preparing the return.

Igberaese's implausible and uncorroborated mileage-deduction claim casts doubt on all of his other testimony and recordkeeping, and the circumstances surrounding his casualty-loss deduction cast particular doubt upon it.  The IRS does not dispute the $2,617 portion of the casualty-loss deduction corroborated by the insurance agent's report.  We find that Igberaese has failed to meet his burden of proving that he incurred the remaining $2,723 of the $5,340 he claimed.

7.   Late-Filing Penalty

The IRS's burden of production for imposing the late-filing penalty of section 6651(a)(1) is satisfied by the undisputed fact that Igberaese filed his return several months late.  Igberaese has not demonstrated that circumstances relating to his job, to his involvement in divorce litigation, or to anything else constitute reasonable cause for the delay.[8]  Therefore, we do not find that he is entitled to relief from the late-filing penalty on reasonable-cause grounds.

8.   Substantial-Understatement Penalty

The accuracy-related penalty of section 6662(a) may be imposed on grounds that include substantial understatement of income tax, sec. 6662(b)(2), and negligence, sec. 6662(b)(1).

---

[8]We observe, moreover, that according to the divorce proceeding docket sheet and the mileage log Igberaese presented, he was able to drive cross-country to California several times to attend professional-association conferences not directly required for his employment about the time he was beginning his divorce.

With respect to the accuracy-related penalty, the IRS has the burden of production, but Igberaese retains the burden of proof. See sec. 7491(c). The IRS's burden of production for imposing the accuracy-related penalty on the ground of a substantial understatement of income tax is satisfied by our finding that Igberaese is not entitled to any of the deductions at issue and by the fact that the understatement resulting from the denial of these deductions exceeds both $5,000 and 10 percent of the tax required to be shown on the return. (We need not consider the ground of negligence because no additional accuracy-related penalty would result.) Because Igberaese did not establish that he in fact incurred any of the expenses at issue (or that he had reasonable cause for erroneously claiming the deductions), we sustain the accuracy-related penalty.

9.   Alleged Due-Process violation

We reject Igberaese's arguments about insufficient consideration of his case at the administrative level. See,

e.g., <u>Doudney v. Commissioner</u>, T.C. Memo. 2005-267 (a Tax Court trial satisfied the taxpayer's constitutional due-process right to review of tax liability).[9]

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.

---

[9]Igberaese has not asserted that the alleged administrative irregularities made him unable to fully present his case to us.